# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

---

### EILEEN MCAFEE,

*Plaintiff-Appellee,*

### v.

### CHRISTINE M. BOCZAR,

*Defendant-Appellant,*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT RICHMOND

---

### OPENING BRIEF OF APPELLANT
### CHRISTINE M. BOCZAR

---

Henry S. Keuling-Stout
KEULING-STOUT, PC
125 Clinton Avenue, East
P.O. Box 400
Big Stone Gap, VA 24219
(276) 523-1676
keulingstout@gmail.com

Michael R. Ward
MORRIS & MORRIS, PC
P.O. Box 30
Richmond, VA 23218
(804) 344-8300
mward@morrismorris.com

*Counsel for Appellant*
*Christine M. Boczar*

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantagne Duplicating Services

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. _12-2481_   Caption: _Eileen McAfee v. Christine Boczar_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Christine Boczar_
(name of party/amicus)

_____

who is _appellant_, makes the following disclosure:
(appellant/appellee/amicus)

1.  Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☒ NO

2.  Does party/amicus have any parent corporations? ☐ YES ☒ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☒ NO
    If yes, identify all such owners:

- 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☒ NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☒ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐ YES ☒ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _Amy A_____    Date: _12-17-12____

Counsel for: _Christine Boczar_____

## CERTIFICATE OF SERVICE
**************************

I certify that on _12-17-12_ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

William A. Hurd
Troutman Sanders LLP
PO Box 1122
Richmond VA 23218

_Amy A_____    _12-17-12_____
(signature)                (date)

07/19/2012
SCC

- 2 -

# TABLE OF CONTENTS

Jurisdictional Statement...........................................................................1

Statement of Issues Presented for Review .................................2

Statement of the Case .................................................................4

Statement of Facts.......................................................................8

    I.     The Information that Boczar Gave to the Magistrate ..............9

    II.    Response of the Magistrate: An Arrest Warrant .....................10

    III.   Where did Boczar Get Her Information? Sources
          For the Information Boczar Gave the Magistrate ..................11

          A.    Conversation between McAfee and Boczar ..............11

          B.    Conversations between McAfee and Health
                Department Officials Yates and Wampler, and
                Then between Yates and Wampler and Boczar ........14

    IV.   The Arrest by Warrant...............................................................19

    V.    The Dog is Found and Tested ...................................................20

    VI.   The Ruling of the Jury ..............................................................20

    VII.  The Court and DRM .................................................................21

Summary of Argument.................................................................22

Argument .....................................................................................26

    I.     Boczar Was Entitled to Qualified Immunity............................26

          A.    The Significance of the Warrant................................26

     B.     Deference is to be Accorded to the Jury's
Resolution of Disputed Factual Issues ...................... 29

     C.     Error of the District Court .......................................... 34

II.    The District Court Erred in Awarding Attorney's Fees .......... 46

     A.     The Applicable Standard of Review ............................. 46

     B.     Ms. McAfee Did Not Obtain a Successful Verdict ....... 47

     C.     Plaintiff Failed to Prove an Hourly Rate .................... 65

Conclusion ................................................................................. 68

Request for Oral Argument ...................................................... 68

Certificate of Compliance ....................................................... 70

Certificate of Filing and Service ............................................. 71

# TABLE OF AUTHORITIES

## CASES

*A.T. Massey Coal Co. v. Massanari*,
  305 F.3d 226 (4th Cir. 2002) ............................................................ 52

*Blanchard v. Bergeron*,
  489 U.S. 87 (1989) ................................................................... 48, 50

*Brinegar v. United States*,
  338 U.S. 160 (1949) ...................................................................... 41

*Buffington v. Baltimore County*, 913 F.2d 113 (4th Cir. 1990), *cert. denied*,
  499 U.S. 906 (1991) ...................................................................... 67

*Perkins v. Mobile Housing Bd.*,
  847 F.2d 735 (11th Cir. 1988)).................................................... 67, 68

*City of Riverside v. Rivera*,
  477 U.S. 561 (1986) ............................................................. 51, 52, 53

*Coalition for Basic Human Needs v. King*,
  691 F.2d 597 (1st Cir. 1982)........................................................... 62

*Depaoli v. Vacation Sales Associate, L.L.C.*,
  489 F.3d 615 (4th Cir. 2007) .......................................................... 66

*Farrar v. Hobby*,
  506 U.S. 103 (1992) .................................................................. 52, 53

*Franks v. Delaware*,
  438 U.S. 154 (1978) ........................................... 27 28, 29, 33, 40, 45

*Freezer v. Miller*,
  163 Va. 180, 176 S.E. 159 (1934)................................... 31, 32, 43, 45

iii

*Goss Graphics System, Inc. v. DEV Industrial,*
    267 F.3d 624 (7th Cir. 2001) ........................................... 60

*Grissom v. The Mills Corp,*
    549 F.3d 313 (4th Cir. 2008) ........................................... 65

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983) ........................................... 48, 49, 50, 51, 58, 60

*Hetzel v. County of Prince William,*
    89 F.3d 169 (4th Cir. 1996) ........................................... 54

*Illinois v. Gates,*
    462 U.S. 213 (1983) ........................................... 40

*Johannsen v. District No. 1-Pac. Coast District, MEBA Pension Plan,*
    292 F.3d 159 (4th Cir. 2002) ........................................... 46

*Johnson v. Georgia Highway Express, Inc.,*
    488 F.2d 714 (5th Cir. 1974) ........................................... 48

*Kothe v. Smith,*
    771 F.2d 667 (2nd Cir. 1985) ........................................... 60

*Lewis v. Kendrick,*
    944 F.2d 949 (1st Cir. 1991) ........................................... 54, 55

*Marks v. United States,*
    430 U.S. 188 (1977) ........................................... 52

*Merchant v. Bauer,*
    677 F.3d 656 (4th Cir. 2012) ........................................... 29

*Messerschmidt v. Millender,*
    132 S. Ct. 1235 (2012) ........................................... 27, 45

*Metropolitan Life Insurance Co. v. Glenn,*
    544 U.S. 105 (2008) ........................................................ 46

*Miller v. Prince George's County, Md.,*
    475 F.3d 621 (4th Cir. 2007) ...................................... 27, 29

*Perdue v. Kenny,*
    559 U.S. 542, 130 S. Ct. 1662 (2010) ......................... 50, 63

*Pickett v. Milam,*
    579 F.2d 1118 (8th Cir. 1978) ........................................ 62

*Plyler* v. Evatt,
    902 F.2d 273 (4th Cir. 1990) ......................................... 65

*Raishe v. Pietroski,*
    623 F.3d 30 (2010) ......................................................... 30

*Robinson v. Equifax Information Services, LLC,*
    560 F.3d 235 (4th Cir. 2009) ...................................... 49, 65

*Rum Creek Coal Sales, Inc. v. Caperton,*
    31 F.3d 169 (4th Cir. 1994) ........................................ 65, 66

*Simmons v. Poe,*
    47 F.3d 1370 (4th Cir. 1995) ................... 27, 28, 29, 39, 45

*Simpson v. Sheahan,*
    104 F.3d 998 (7th Cir. 1997) ................................ 56, 61, 62

*Spinelli v. United States,*
    393 U.S. 410 (1969) ....................................................... 41

*Torchinsky v. Siwinski,*
    942 F.2d 257 (4th Cir. 1991) .......................................... 27

*U.S. v Legg,*
    18 F.3d 240 (4th Cir. 1994) ........................................... 37

*Westmoreland Coal Co. v. Cox,*
   602 F.3d 276 (4th Cir. 2010) ............................................. 66

*Wiggs v. Farmer,*
   205 Va. 149, 135 S.E.2d 829 (1964) .................................. 45

## STATUTES

28 U.S.C. § 1291 .................................................................. 1
28 U.S.C. § 1343(a)(3) ......................................................... 1
28 U.S.C. § 1367(a) .............................................................. 1
42 U.S.C. § 1983 ............................................... 1, 27, 25, 54
42 U.S.C. § 1988 ................................ 25, 48, 52, 55, 58, 61, 62
42 U.S.C. § 1988(b) ........................................................... 48
VA. Code § 18.2-313.1 ............................... 4, 5, 10, 42, 44

## OTHER AUTHORITIES

*Black's Law Dictionary* 1148 (9th ed. 2009) ........................... 55

# Jurisdictional Statement

The district court had subject matter jurisdiction over Count I pursuant to 28 U.S.C. § 1343(a)(3), which grants jurisdiction over cases arising under 42 U.S.C. § 1983. Counts II (malicious prosecution) and III (false imprisonment) arose under Virginia law from the same operative facts. The district court had jurisdiction over those pursuant to 28 U.S.C. § 1367(a).

The Fourth Circuit has jurisdiction over the appeal under 28 U.S.C. § 1291. The district court entered three judgments, each of which was final as to the issues determined by it. The first fee petition was granted and judgment on it entered November 2, 2012 awarding $322,340.50. The defendant noted her appeal to this on November 2, 2012. The second fee petition was granted December 19, 2012. The Defendant filed her Notice of Appeal to this on January 17, 2013.

The jury returned a verdict for the Plaintiff on Count I for $2,943.60 on July 6, 2012. Judgment on the verdict was delayed to permit the Defendant to renew her claim for Qualified Immunity. (JA 401.) The district court stated that no judgment could be entered on the verdict if there was still an outstanding issue of Qualified Immunity.

(JA 390.)  The district court denied Boczar's Renewed Motion for Qualified Immunity on August 15, 2012 (JA 570-579), but did not enter the final judgment on the verdict until February 22, 2013.  (JA 802.) Defendant filed her Notice of Appeal to this Judgment on March 15, 2013.  (JA 803-805.)

## Statement of Issues Presented for Review

1.    Whether it was error for the district court to deny the Defendant Qualified Immunity where (1) Plaintiff McAfee was arrested on a warrant issued by a Magistrate based on written and oral information provided by Defendant Animal Control Officer Boczar; (2) the jury found in favor of Defendant on the state claim of malicious prosecution; (3) the jury decided Ms. McAfee was not entitled to an award of punitive damages, and (4) where the court failed to identify, accept and/or correctly address, and give the necessary deference to the jury's determination of the facts necessary for the court to decide whether Defendant deliberately falsified allegations in her presentation to the Magistrate or omitted facts in her presentation to the Magistrate with the intent to make the information misleading.

2. Whether the district court in deciding the reasonable attorney's fee imposed on Defendant a retributive sanction not authorized by law when it refused to consider the degree of success, made findings of fact not in the evidence and imposed upon the Division of Risk Management, a nonparty in the case, a duty to settle--and the responsibility for not settling--the case for an amount and at a stage of the litigation set out by the district court.

3. Whether the district court erred in awarding the original judgment for fees and expenses of $332,646.01 and the Supplemental Judgment for Fees of $12,628 to the counsel representing Plaintiff where (1) the jury awards Plaintiff McAfee $2,943.00, being the stipulated amount for Plaintiff's General District Court attorney's fee and expenses, no compensation for personal or emotional injury and (2) where the jury finds no actual malice and no ill will, malevolence, grudge, spite, wicked intention, or conscious disregard for the rights of Plaintiff McAfee arising out of the alleged conduct of the Defendant and (3) where the Court failed to apply the factors necessary to determine a reasonable attorney's fee, including the absence of proof as to a reasonable hourly rate.

## Statement of the Case

Christine Boczar, an Animal Control Officer, was notified on January 7, 2011 by a local hospital that Eileen McAfee had been bitten by a dog. Sgt. Boczar promptly began an investigation to locate the dog so that the health department could examine the dog for rabies.

After talking with Ms. McAfee and with two employees of the Commonwealth of Virginia health department to whom Ms. McAfee (at Boczar's recommendation) had talked, Boczar appeared before a Magistrate on January 13, 2011 who, based on Boczar's written and oral statements, issued a warrant that Ms. McAfee be arrested for knowingly withholding information from any lawfully authorized governmental agent which would reasonably lead to the location of an animal reasonably identifiable as one that has potentially exposed a human being to rabies. Va. Code § 18.2-313.1.

Not until Ms. McAfee was being transported by Deputy Sheriff Adam Sadler to the office of the Magistrate did Ms. McAfee reveal sufficient information for Sadler to identify the location of the potentially rabid dog and forward that information to Sgt. Boczar.

The warrant against Ms. McAfee was dismissed in General District Court and Ms. McAfee filed suit against Sgt. Boczar alleging unreasonable seizure under the Fourth Amendment, malicious prosecution, and false imprisonment under Virginia law, personal and emotional injury, and punitive damages. (JA 20-32.)

Sgt. Boczar responded, denied the allegations, and set up as defenses Qualified Immunity and that Ms. McAfee was guilty of violating Code § 18.2-313.1. (JA 33-40.)

Sgt. Boczar filed a Motion for Summary Judgment arguing that she was entitled to Qualified Immunity, which Motion was denied by a decision of the magistrate judge which decision was upheld by the district court. (JA 56-57.)

Before, during, and after the jury trial of the case, the district court insisted that the Commonwealth of Virginia, Department of the Treasury, Division of Risk Management ("DRM") and in particular its employee Michael Parham forced Ms. McAfee to bring the case when DRM should have offered her an apology and money, a course of action which the district court thought would have concluded the matter. Believing that the DRM did not appreciate the merits of the case and

that it was impeding any compromise discussions, the district court ordered Mr. Parham to appear in court for the trial of the case. (JA 796-797.)

The jury trial began on July 2, 2012. Evidence was taken on July 2 and July 3, 2012. Jury instructions and closing arguments occurred on July 5, 2012 and the verdict was rendered on July 6, 2012. The jury found for the Plaintiff on Count I. The jury found for the Defendant on Count II. The jury awarded $2,943.60, the amount stipulated by the parties as Plaintiff's attorney fees and cost in the criminal proceeding. The jury awarded no personal or emotional injury compensation. It did not find actual malice or award punitive damages. (JA 392-393.)

After the jury trial, Sgt. Boczar renewed her Motion for Qualified Immunity as to the alleged violation of Fourth Amendment rights as provided for in the Final Pre-Trial Order. (JA 83.) The district court on August 15, 2012 filed its Memorandum Opinion denying Qualified Immunity. (JA 570-579.)

Ms. McAfee had also asserted a claim of false imprisonment under state law (Count III), which was at the motion of Sgt. Boczar dismissed on July 2, 2012.

After the jury verdict, Ms. McAfee filed her Petition for Attorney's Fees and Costs. Defendant Boczar filed her Brief in Opposition. Briefing was suspended while parties were directed to meet with a Magistrate Judge to discuss settlement. The settlement conference held on September 19, 2012 resulted in a report by the Magistrate Judge that the settlement conference was unsuccessful. In spite of the fact that matters in mediation are confidential, the Magistrate Judge reported that DRM "did not negotiate in good faith." (JA 580-581.)

On September 21, 2012 the district court entered an Order directing that McAfee's reply brief to specifically address a number of issues posed by the district court. (JA 582-584) Ms. McAfee filed her reply on October 5, 2012. The district court entered its Order and Judgment on November 2, 2012, awarding McAfee fees in the amount of $322,340.50 and costs in the amount of $10,305.51 for a total of $332,646.01, with interest, and granting leave to file a "fee-on-fee" petition. (JA 648-694.) Sgt. Boczar noted an appeal to this November 2, 2012 Order. (JA 704-706.)

On November 16, 2012, Ms. McAfee filed a "Supplement Fee Petition." The district court granted the Supplemental Fee Petition by

Memorandum Opinion and Order and Judgment, both dated December 19, 2012. (JA 707-715.) The Order and Judgment against Defendant Boczar is for $12,628, plus interest. Sgt. Boczar noted her appeal to this Order and Judgment on January 17, 2013. (JA 798-800.)

On February 22, 2013 the Court entered a Judgment for Ms. McAfee against Sgt. Boczar for $2,943.60 based on the jury verdict returned July 6, 2012. (JA 802.)

By Notice of Appeal dated March 15, 2013, Sgt. Boczar noted her appeal to this February 22, 2013 Judgment and renewed her Notice of Appeal to the Order and Judgment dated November 2, 2012, and her Notice of Appeal to the Order and Judgment dated December 19, 2012. (JA 803-805.)

## Statement of Facts

Ms. McAfee feared that revealing the location of the potentially rabid dog that bit her would lead to the death of the dog. It was only after she was arrested pursuant to a warrant sought by Sgt. Bozcar did Ms. McAfee provide information of the location of the dog sufficient for Sgt. Boczar and officials of the Powhatan County Health Department to find and examine the dog.

## I.     The Information that Boczar Gave to the Magistrate.

On January 13, 2011, six days after the Ms. McAfee was bitten by a potentially rabid dog, Sgt. Boczar, after filling out a criminal Complaint and after talking about this case with an assistant Commonwealth's Attorney for Powhatan County, proceeded to provide the following information to and have the following interchange with a magistrate.  (JA 269-272)

1.     Boczar first dialed the magistrate and when he came on line she faxed him a copy of the criminal Complaint (JA 741), which Sgt. Boczar had prepared.  (JA 272.)

2.     The criminal Complaint was vague, so the Magistrate asked Sgt. Boczar to " expand upon  what other  information [ Boczar] had which led [Boczar] to believe this charge should go through".  (JA 273.)

3.     Boczar gave this information to the Magistrate:

> I told him that I had—the information that I had received from the hospital, that there was, in fact, a bite to Ms. McAfee, the conversation I had with Judy Yates in reference to her saying that Ms. McAfee had not handed over the information, the information that I had received from Ms. McAfee in reference to her saying she would not hand over the information because it would lead possibly to the dog being euthanized, the fact that Ms. McAfee had obtained a spot for a dog in another county and had done that on her

own, as well as finding a home—not a home but finding a spot at a local kennel for the dog to go.

...As well we discussed the conversation with Ms. Wampler or Ms. Wampler said she believed Ms. McAfee had the information but she would not hand it over because she did not want the dog to be euthanized. The magistrate asked a few questions in reference to the time frame. He wanted to know the "window" as far as rabies. Boczar told the magistrate that it was important to find out something in reference to the dog's location within a ten day window so that Ms. McAfee could start her shots. The magistrate wanted to know if rabies was 100 percent fatal. Boczar explained that it was.

*(*JA 273-274)

## II.    Response of the Magistrate: An Arrest Warrant.

After hearing the information provided by Sgt. Boczar the Magistrate filled out the information on the warrant at his office, which warrant he faxed back to Sgt. Boczar. Sgt. Boczar filled out no part of the warrant. (JA 742-743.) The Magistrate, not Sgt. Boczar, checked the box "EXECUTED by arresting the Accused named above on this day" rather than the box "EXECUTED by summoning the Accused named above on this day." (JA 274-275.)

The Warrant charged a violation of Va. Code § 18.2-313.1:

It shall be unlawful for any person to (i) knowingly withhold information from, or knowingly give false information to, any

lawfully authorized governmental agent which would reasonably lead to discovery or location and capture of any animal reasonably identifiable as one that has potentially exposed a human being to rabies (ii) upon the request of an animal control officer, a law-enforcement officer, or an official of the Department of Health, willfully fail to grant access to any animal owned, harbored, or kept by that person that is suspected of having caused a rabies exposure to a human being; or (iii) upon notice by animal control officer, a law-enforcement officer, or an official of the Department of Health, willfully fail to comply with a confinement, isolation, or quarantine order. [1]

## III. Where did Boczar Get Her Information?  Sources For the Information Boczar Gave the Magistrate.

### A.    Conversation between McAfee and Boczar.

Christine Boczar was a Sergeant with the Powhatan County Sheriff's Office, Division of Animal Control.  She had been in this department for six years running the county's animal shelter and supervising three employees.  Her tasks included filling out animal exposure reports and then giving them to the Health Department.  Any questions she would refer to Judy Yates at the Powhatan County Health Department.  On Friday January 7, 2011 Sgt. Boczar was given potential rabies exposure information from St. Francis Medical Center.

---

[1] Sections (ii) and (iii) were not included in the jury instructions. (JA 351-352).

She was given the victim's name, address, and phone number. There had been a dog bite. Sgt. Boczar's responsibility was to locate the dog so she could verify whether it had been properly vaccinated for rabies. Sgt. Boczar called Eileen McAfee on January 7 and left a message. Boczar communicated with Ms. McAfee on January 10, 2011. (JA 246-249.)

Ms. McAfee acknowledged that she had received a call from "Animal Control" on January 7, the date of the dog bite and that Sgt. Boczar left her a message. Ms. McAfee and Sgt. Boczar had a conversation on Monday January 10, 2011. Ms. McAfee remembers the conversation as being brief but does remember asking Sgt. Boczar how Powhatan handled dog bite cases. Ms. McAfee wanted to know "Do you observe the dog or do you have to impound them," to which Sgt. Boczar responded, "that's up to the health department, we take our instructions from them, you will have to call and to talk to them and here is the number. And she gave me the number." (JA 99-102.)

Ms. McAfee told the jury that she had told Sgt. Boczar she had been bitten "by a dog living outside on a chain..." and that the owner

was not able to tell her, Ms. McAfee, if the dog was current on its vaccination. (JA 158-159.)

Ms. McAfee told Sgt. Boczar that "she could probably find the house." She admitted she did not offer to drive Sgt. Boczar to the house and she did not provide a first or a last name of the owner. Ms. McAfee did not offer to send any photos to Sgt. Boczar that she had in her possession. (JA 160; 730.) Ms. McAfee understood that Sgt. Boczar worked for Powhatan County Animal Control. (JA 172.)

This was only part of Sgt. Boczar's conversation with Ms. McAfee. Sgt. Boczar asked for information regarding the owner of the dog. Ms. McAfee wanted to know what could happen to the owner of the dog, if a summons would be issued to the owner, and if she could pay for the summons. Ms. McAfee was very upset in reference to the safety of the dog. Sgt. Boczar reviewed scenarios of what could happen to the dog, typically a matter Sgt. Boczar would not go over with someone who was not the actual owner of the dog. McAfee became quite emotional at the point that Sgt. Boczar explained to her that the dog could possibly be euthanized. Ms. McAfee said that she was concerned that the dog would be euthanized if she handed over the information.

Upon being asked for the location of the dog, Ms. McAfee stated that she went there with a friend and she thought she could get back to the location with the friend. She did not know the dog owner's address. Sgt. Boczar advised Ms. McAfee to contact her friend and to get back with Boczar and that nothing could be done until she heard back about the location of the dog. Ms. McAfee said she would contact her friend.

The conversation ended with Sgt. Boczar emphasizing the importance of getting the information, there being a ten day window as far as McAfee's health was concerned. (JA 249-253.)

## B. Conversations between McAfee and Health Department Officials Yates and Wampler, and Then between Yates and Wampler and Boczar.

After talking with Sgt. Boczar on January 10, 2011, Ms. McAfee called Powhatan County Health Department and talked to Judy Yates, who advised that the dog might be killed. (JA 106-07.)

Henrico Health Department Nurse Sharon Wampler called Ms. McAfee on January 10, 2011. Ms. McAfee returned Nurse Wampler's telephone call on January 11. (JA 109-110.) Between January 11 and January 12, 2011, Ms. McAfee had approximately eight conversations with Nurse Wampler, six on the 11th and two on the 12th. (JA 111.)

Sgt. Boczar did not seek a warrant immediately after her conversation with Ms. McAfee.

Sgt. Boczar's next step was to give an "animal exposure report", to Judith Yates. (JA 736.) Ms. Yates knew Sgt. Boczar and that she worked for Animal Control. A part of Ms. Yates' job was to receive and process animal exposure reports.

Sgt. Boczar's January 10, 2011 note in the animal exposure report states, "unwilling to give information Advised over phone what would happen. I explained about Rabies exposure and told her to call Health Dept." (JA 736.)

Sgt. Boczar did this so that the Health Department would know that she did not have the needed information. Ms. Yates talked to Sgt. Boczar on several occasions. (JA 203-206; 254-256.)

Ms. Yates' office is located in Powhatan. She needed to know the person who was exposed and the animal's whereabouts so that someone from the Health Department could check the condition of the dog.

Ms. McAfee called the Health Department and spoke with Ms. Yates and, though Yates does not remember the details of the conversation, she does not deny the statement of Sgt. Boczar that she,

Yates, had spoken to Ms. McAfee "in reference to the whereabouts to the dog and that Ms. McAfee had not given her any information." (JA 203-204, 209, 254-256)

Sgt. Boczar also talked to Nurse Wampler about the animal exposure report. Sgt. Boczar talked to Nurse Wampler before and up to January 13, 2011. Nurse Wampler told Sgt. Boczar that she was trying to locate the dog and wanted to know if Sgt. Boczar knew its location, to which Sgt. Boczar responded that "we did not at that time." (JA 258.)

There were two phone conversations and a few phone messages between Nurse Wampler and Sgt. Boczar. Plus according to the testimony of Sgt. Boczar, unrefuted by Ms. McAfee, Nurse Wampler told Sgt. Boczar that Ms. McAfee had arranged for the dog to be taken out of Powhatan County to Henrico Animal Control and that Ms. McAfee was going to find a kennel that would quarantine the dog since the Henrico Animal Control Shelter was full. (JA 260.) Nurse Wampler told Sgt. Boczar, "She believed that Ms. McAfee knew the location of the dog but was unwilling to give it to me because she was very concerned that the dog would be euthanized because of her actions." (JA 257-260.)

Sharon Wampler was a public health nurse with the Henrico Health Department and employed by the Commonwealth of Virginia. Ms. McAfee lived in Henrico County. It is Nurse Wampler's job to talk to a victim of a dog bite and see whether there needs to be rabies postexposure prophylaxis recommended.

The animal exposure report completed by Sgt. Boczar (JA 736) was faxed to Nurse Sharon Wampler by the Powhatan County Health Department. Since Ms. McAfee lived in Henrico County it was Nurse Wampler's responsibility to call Ms. McAfee to see whether or not the series of 4-5 rabies shots (rabies postexposure prophylaxis) would be necessary.

Nurse Wampler called Ms. McAfee, told her that she, Nurse Wampler, was a public health nurse and that she was calling Ms. McAfee because the Health Department had received a report showing that Ms. McAfee had received a dog bite. Nurse Wampler was calling to find out more about it and whether or not the rabies postexposure prophylaxis would be indicated. Nurse Wampler stated the significance of knowing the location of the dog: that if the dog is alive after 10 days

then it did not have rabies at the time of the bite and the rabies postexposure prophylaxis would not be necessary.

Nurse Wampler spoke to Sgt. Boczar on January 11 and January 12, 2011. According to Nurse Wampler, Ms. McAfee never advised Nurse Wampler of the address, the location (except that it was in Powhatan County), nor the name of the owner of the dog. When asked whether Ms. McAfee expressed to Nurse Wampler her concern about what might happen to the dog, Nurse Wampler stated "she [Ms. McAfee] was concerned when I first talked to her that the dog may be killed." And during these conversations with Sgt. Boczar on January 11 and 12, Nurse Wampler said "that she [Ms. McAfee] had concerns about what would happen to the dog and that is why she [Ms. McAfee] would not give the location of the dog." (Brackets added for clarity, JA 218.) In answer to the question of whether Ms. McAfee in her conversations with Nurse Wampler had ever given Nurse Wampler the name of the owner or the address of the dog, the answer was, "No, she did not." Nurse Wampler also told Sgt. Boczar that Ms. McAfee had concerns

about what would happen to the dog after the location of the dog was revealed. [2]  (JA 212-218, 222-224.)

## IV.    The Arrest by Warrant.

The deputy from the Powhatan Sheriff's Office who took Ms. McAfee into custody on January 13, 2011 was Adam Wade Sadler.  Sgt. Sadler was transporting Ms. McAfee to the office of the Magistrate in Powhatan County where he served her with a warrant.  During the drive as Sgt. Sadler passed Academy Road, Ms. McAfee volunteered that she believed the owner lived on that road.  Also during the drive, Ms. McAfee gave Sgt. Sadler what she believed was the last name of the dog's owner.  Sgt. Sadler then went to the "Incident Base Reporting Computer" to see if he could find someone with that last name who resided on Academy Road.  He found such a name, took a sticky note and wrote down the full name, the owner's address, and his home phone number as it was entered into the computer.  He showed the information to Ms. McAfee, asked if it looked familiar, to which she responded, "It's possible."  (JA 233.)

---

[2] Plaintiff objected to Nurse Wampler's testimony about McAfee's concerns for the dog's safety being the reason McAfee would not divulge

Sgt. Sadler took the sticky note and placed it on top of the original warrant and later transferred it to a copy of the warrant that went to Sgt. Boczar's box. After Ms. McAfee went before the Magistrate, Sgt. Sadler advised Sgt. Boczar about the information and how he obtained it. (JA 157, 228-233, 240-241.)

## V.    The Dog is Found and Tested.

As soon as Sgt. Boczar received the information from Sgt. Sadler, information that he had pieced together from his conversation with Ms. McAfee, Sgt. Boczar called Ms. Yates at the Health Department and informed her that she, Sgt. Boczar, had the information on the location of the dog. The same day, January 13, David Powers, the rabies specialist for the Chesterfield Health District which serves the Powhatan Health Department, met with Sgt. Boczar at the location of the dog to assess whether the dog had rabies. (JA 276, 311-312.)

## VI.    The Ruling of the Jury.

The Jury unanimously found that Ms. McAfee failed to prove her state law claim of malicious prosecution against Sgt. Boczar. (JA 392-393.)

---

the dog's location. The objection was overruled. (JA 222-224)

The jury unanimously decided that by a preponderance of the evidence Ms. McAfee was entitled to no punitive damages.

The district court instructed the jury that if it found against Sgt. Boczar on either Count I or II, it could award damages for any insult, humiliation, mental illness, and/or inconvenience Ms. McAfee suffered in the past or could be reasonably expected to suffer in the future, and that she could recover any legal expenses associated with defending the state court criminal proceeding against her. (JA 353.)

The only damage awarded by the jury was the expenses for defending against the criminal proceedings in state court. (JA 393.) The $2,943.60 was not a fact determined by the jury but was a fact stipulated by the parties and announced to the jury. (JA 329-330.)

## VII. The Court and DRM.

On the second day of the trial, July 2, 2012, the district court ordered an employee of DRM to appear in court because, allegedly, the employee "has not evinced an appreciation of the merits of the Plaintiff's case or the strength of the defense and that the failure to appreciate this point has impeded meaningful compromise discussions,

as well as the interest of justice when having the possibility of compromise, discussed, and assessed…" (JA 796.)

The district court concluded that the degree of success factor could not be used to reduce the time component of McAfee's fee request because Sgt. Boczar did not offer a public apology and because DRM did not pay Ms. McAfee's out-of-pocket expenses but instead, allegedly, forced Plaintiff to bring a lawsuit to vindicate her rights. The district court classified this as a needlessly litigious approach taken by Sgt. Boczar and DRM. (JA 692.)

On June 27, 2012 at the final pre-trial conference, the district court noted that "this case doesn't belong in federal court. It doesn't belong anywhere-…" (JA 58-59.)

## Summary of Argument

The district court described the event that is essential to the Qualified Immunity inquiry in this case as a "fact of no consequence." (JA 577.) That event was when the Magistrate issued a warrant based on the information sought by and presented to him. The error in this conclusion is two-fold. First, the fact that Sgt. Boczar sought a warrant means that probable cause for the purposes of Qualified Immunity was

22

actually determined by the Magistrate. Second, the existence of this warrant protects Sgt. Boczar as a matter of law from deficiencies, or lack of probable cause, in the warrant so long as she did not knowingly or intentionally or with a reckless disregard for the truth intentionally falsify the statements to or hide material facts from the Magistrate. This conduct by the officer must rise to the level of a flagrant police action.

This issue of deliberately falsified allegations was not given to the jury but the jury nevertheless answered the question as to whether there was such flagrant police action by finding as to Count II that Sgt. Boczar acted without malice or wrongful motive. The jury determined that the Plaintiff was not entitled to punitive damages, finding no actual malice, nor was she entitled to any compensation for physical or emotional injury.

Faced with these multiple verdicts of the jury it was incumbent upon the district court when addressing the Qualified Immunity issue post-jury trial to construe the facts necessary to make a decision in a manner supportive of the jury's verdicts and to give deference to the jury's discernible resolution of disputed factual issues.

23

It was error for the district court to address the Qualified Immunity defense by looking at all the evidence in the light most favorable to Plaintiff. It was error for the district court to conclude that Sgt. Boczar acted with reckless disregard for the truth and misrepresented facts and procured the warrant for arrest because it was Sgt. Boczar's purpose to run McAfee out of the county because McAfee was an animal rights activist. It was error for the district court to come to this conclusion because such conclusion was contrary to the evidence and the jury's verdicts.

A jury convinced that Sgt. Boczar exhibited an intentional reckless disregard for the truth or other flagrant police action would not have unanimously decided that Ms. McAfee had failed to prove malice in fact and that Ms. McAfee was entitled to no punitive damages (actual malice), to no compensation for personal or emotional injuries, and that the amount to be awarded would be a stipulated $2,943.60 for Ms. McAfee's out-of-pocket expenses in the criminal proceeding.

Sgt. Boczar acted as a reasonable officer under the same circumstances would have acted. It was vital to public safety, including that of Ms. McAfee, that the Health Department determine whether the

dog was rabid within 10 days of the bite. Under the circumstances of this case it would have been objectively unreasonable for an animal control officer with the information she had acquired from Ms. McAfee and the two Health Department officials to fail to pursue a warrant.

The district court in this case erred in awarding Ms. McAfee her attorney's fees because she was barely successful in her lawsuit. Pursuant to 42 U.S.C. § 1988, a "prevailing party" in a § 1983 case may be entitled to a reasonable attorney's fee. The Supreme Court's guidance concerning the calculation of a "reasonable attorney's fee" requires a court to give primary consideration to whether the party was successful. There are different requirements for success, but the operative one for this appeal is the prevailing party's overall success in the case. For a case seeking the redress of private damages, this is determined by, in part, a consideration of the verdict in light of what was at issue.

The verdict was a bare, technical victory. The parties stipulated that Ms. McAfee had $2,943.60 in economic losses. The jury found in favor of Sgt. Boczar on Count II, and it awarded no compensatory

damages over the stipulated amount, no punitive damages, and no damages for any mental anguish.

Assuming the district court was required to award attorney's fees in any amount, it erred in finding that Ms. McAfee proved a reasonable hourly rate to satisfy the lodestar calculation. Ms. McAfee's evidence on a reasonably hourly rate only established that big firms charge big clients a lot for their work in other types of cases. The evidence failed to establish a reasonable rate for comparable work in this jurisdiction. The failure of proof meant that Ms. McAfee failed in her burden of proof on this issue and should not have been entitled to any fees.

## Argument

### I.     Boczar Was Entitled to Qualified Immunity.

#### A.     The Significance of the Warrant.

The Fourth Circuit has encouraged law enforcement officers to seek warrants because magistrates from their detached perspective serve as an essential checkpoint between the government and the citizens so that when an officer of the law protects a suspect's rights by obtaining a warrant from a neutral magistrate the officer should, in

turn, receive some protection from suit under 42 U.S.C § 1983. *Torchinsky v. Siwinski*, 942 F2d. 257, 262 (4th Cir. 1991).

The question which was not presented to, but was actually answered by the jury, the threshold question in determining Qualified Immunity, is whether Sgt. Boczar knowingly, intentionally, or with a reckless disregard for the truth falsified statements to the judicial officer necessary to the probable cause determination. Without proof of intentional falsification there is no Fourth Amendment violation, where, as here, the arrest was based on a warrant issued by a judicial officer, here a magistrate. *Franks v. Delaware*, 438 U.S. 154, 155-156 (1978); *Miller v. Prince George's County, Md.*, 475 F.3d 621, 627-631 (4th Cir. 2007); *Simmons v. Poe*, 47 F.3d 1370, 1384-1386 (4th Cir. 1995).

The threshold for establishing this proof is high. When an alleged Fourth Amendment violation involves a seizure pursuant to a warrant the fact that a neutral magistrate issued a warrant "is the clearest indication that officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'" *Messerschmidt v. Millender*, 132 S.Ct. 1235, 1245 (2012). Fourth Circuit case law shows

the general willingness to affirm, "under a highly differential standard of review, a Magistrate's finding of probable cause." *Simmons,* 47 F.3d at 1378.

Every fact recited in the warrant affidavit or the information provided by the officer to the judicial officer does not have to be correct "for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." But the information is to be truthful in the sense that the information put forth "is believed or appropriately accepted by the affiant as true." *Franks,* 47 F.3d at 165.

Mere negligence in recording the facts relevant to a probable cause determination is not enough. The officer's acts must rise to the level of a flagrant police action. Reckless disregard for the truth may not be inferred from the omission of a fact itself. The omission must do more than potentially affect the probable cause determination, it must be necessary to a finding of probable cause. It must be such that its inclusion in the presentation to the magistrate would defeat probable cause in the arrest. Omitted information that is potentially relevant

but not dispositive is not enough to deny an officer the protection of Qualified Immunity. *Simmons*, 47 F.3d at 1384.

For reckless disregard of the truth to be demonstrated there must be proof of intentional falsification, deliberately falsified allegations, *Franks v. Delaware*, 438 U.S. 154, 168 (1978).

With respect to omissions, reckless disregard can be established by evidence that a police officer failed to inform the judicial officer of facts that the officer knew would negate probable cause. The evidence must show that the officer acted with a high degree of awareness of the statement's probable falsity and that when reviewing all the evidence the officer must have entertained serious doubts as to the truth of her statements or obvious reasons to doubt the accuracy of the information she reported. *Miller*, 475 F.3d at 627.

### B. Deference is to be Accorded to the Jury's Resolution of Disputed Factual Issues.

The Fourth Circuit has not established the procedure for resolving Qualified Immunity after a jury trial. It commented about such a determination in *Merchant v. Bauer*, 677 F.3d 656, 665 fn. 6 (4th Cir. 2012) when it stated that Bauer is entitled "to reassert the [Qualified

Immunity] defense at trial, pursuant to which the jury could resolve the disputed facts in his favor, such that Qualified Immunity applies."

The court determines Qualified Immunity. The question is how does the district court address the findings of the jury? Sgt. Boczar submits that in her case the jury resolved both a disputed fact necessary for the jury to determine an issue presented to it at trial (the presence or absence of malice) and a fact determinative of the protection of Qualified Immunity (Boczar's conduct was not malicious).

The First Circuit in the case of *Raishe v. Pietroski*, 623 F.3d 30 (2010) held that a district court's denial of Qualified Immunity is a legal determination that is reviewed *de novo*, that in reviewing a question of Qualified Immunity resolved after a jury verdict a court must construe the evidence in the light most favorable to the party that prevailed at trial giving deference to the jury's discernible resolution of disputed factual issues, and that facts are to be construed in a manner supportive of the jury verdict. The availability of Qualified Immunity after a trial is a legal question informed by the jury's findings of fact but ultimately committed to the court's judgment. *Id.* at 35.

In this case the jury resolved multiple issues. It determined that as to Count I the evidence did not support that Ms. McAfee was guilty of violating Virginia §18.2-313.1 (JA 347; JA 392.)

The jury also decided as to Count I that Ms. McAfee did not suffer insults or humiliation, any mental anguish, or inconvenience (JA 393), but only her stipulated out-of-pocket expenses. (JA 329-330)

The jury unanimously found that Sgt. Boczar's conduct exhibited no malice. (JA 393.)

The definition of malice was set into place by the Virginia Supreme Court in 1934 in the case of *Freezer v. Miller*, 163 Va. 180, 176 S.E. 159, 169-170 (1934). The district court stated the definition in its jury instruction, namely that "malice means when the controlling motive for instituting the criminal proceedings that were instituted is any reason except a genuine desire to see justice done, to enforce the law, or to punish the guilty." (JA 350, 374-375; *Freezer*, 163 Va. at 169.) Malice in an action for malicious prosecution is always a question of fact exclusively for the jury. Even if there was no probable cause for the prosecution, but it is shown that there was in fact no wrongful motive, the action for malicious prosecution cannot be maintained and the

verdict for a plaintiff will be set aside. If there is no malice in fact, there can be no verdict for malicious prosecution. Malice is essential to the maintenance of any such action, and not merely to the recovery of exemplary damages. *Id.* at 170.

The only difference between Count I, upon which the jury found for the Plaintiff, and Count II, where the jury found for Defendant, is the existence or nonexistence of malice. (JA 392-93; JA 349-50.)

Finding for Boczar as to Count II, the jury determined that there was in fact no wrongful motive; Sgt. Boczar's controlling motive for instituting the criminal proceedings against Ms. McAfee was not for *any* reason except a genuine desire to see justice done, to enforce the law, or to punish the guilty. This was the jury's decision even though it could have inferred malice from the lack of probable cause.

When the jury decided there was no malice it decided also that there was no actual malice because under Virginia law for there to be actual malice there had to have been a finding by the jury that the controlling motive of Sgt. Boczar's actions was a reason other than a bona fide desire to suppress crime and bring the guilty to punishment. *Freezer,* 163 Va. at 170.

The jury unanimously decided that Ms. McAfee was not entitled to punitive damages. So the jury decided (a) not to punish Boczar for extraordinary conduct or to serve as an example and warning to others not to engage in the type of conduct exhibited by her; (b) that it was not going to hold that Sgt. Boczar acted with ill will, malevolence, grudge, spite, wicked intention, or a conscious disregard of the rights of another; and (c) that it was not going to award punitive damages to address (i) the harm caused, (ii) the defendant's awareness of the wrongfulness of her conduct and (iii) the efforts of the defendant to conceal her conduct. (JA 393; 355-357.)

It is the jury's factual determinations which must inform the determinative issue for Qualified Immunity, namely whether Sgt. Boczar in providing the information to the Magistrate deliberately falsified allegations to demonstrate probable cause or omitted material facts from her presentation to the Magistrate which she knew would defeat a probable cause determination. *Franks v. Delaware*, 438 U.S. 154, 168 (1978).

Appellant submits that the jury's verdict of no malice and no actual malice and no physical or emotional damages is totally

inconsistent and opposed to the conclusion by the district court in this case that Sgt. Boczar acted with reckless disregard for the truth.

## C.    Error of the District Court.

The district court in ruling against Qualified Immunity for Sgt. Boczar did not raise or correctly address the significance of the facts that (a) Ms. McAfee was arrested pursuant to a warrant issued by a Magistrate; (b) the jury ruled in favor of Sgt. Boczar on the issue of malice; (c) the jury awarded no punitive damages, meaning no actual malice, and (d) the jury awarded as damages only a reimbursement of Ms. McAfee's out-of-pocket cost and expenses for her general district court trial.  This was error.

As to the significance of the warrant, the district court stated: "That fact is of no consequence here." (JA 577.)  The district court weighed only the facts relevant to Count I and viewed all the facts in the light most favorable to Ms. McAfee. It did not consider, view, or weigh in a light most favorable to Sgt. Bozcar, in a manner supportive of the multiple jury verdicts, (a) the facts relevant the jury's Count II determination of no malice, and (b) the jury's answers and the

significance of the answers to the Court's questions in the jury verdict about damages.  (JA 573-578.)

The district court does not address the jury's necessary determination that Boczar's controlling motive for instituting the criminal proceedings was only a genuine desire to see justice done, to enforce the law, or to punish the guilty.

The conclusion of the district court was that the controlling motive of Sgt. Boczar was to run Ms. McAfee out of the county.  The Court ruled that because Ms. McAfee expressed her concerns for the welfare of the dog, Sgt. Boczar was angered, confusing Ms. McAfee with an animal rights activist who had previously caused difficulty to Sgt. Boczar, that Boczar would not tolerate a repetition of that behavior, that Boczar wanted Ms. McAfee out of the county "and it was for that reason Boczar procured the warrant for McAfee's arrest. In so doing, Boczar actually misrepresented the facts."  (JA 576-577.)  This conclusion of the district court is error as it is inconsistent with the jury's finding of no malice.

The district court acknowledged that Sgt. Boczar had reasons to conclude that McAfee was withholding the location of the dog (JA 571),

but stated that the reasons are frail and concludes that the existence of a warrant in this case is a fact of no consequence.

The district court then held that it was clear that Sgt. Boczar acted with reckless disregard for the truth when she told the Magistrate that Ms. McAfee refuses to give the location of the dog. (JA 741; 577, fn.1.)

The district court supported this conclusion by insisting (a) that Sgt. Boczar had no knowledge that Ms. McAfee was still refusing to provide the necessary information as to the dog's whereabouts, (b) that McAfee had volunteered to help lead Boczar to the location of the dog, and (c) that Boczar had admitted that McAfee had told Boczar she could find the dog. (JA 575-576.) These conclusions by the district court are contrary to the facts.

The Magistrate was supplied with more than the criminal Complaint (JA 741), which document says Ms. McAfee refuses to give information of the dog. The Magistrate found the criminal Complaint vague and wanted a brief overview of the incident which Boczar provided. (JA 273-274.)

There is no evidence to refute that Sgt. Boczar gave this information to the Magistrate. The district court did not credit the information Sgt. Bozcar gave to the Magistrate, namely the information that Ms. Yates and Nurse Wampler gave Sgt. Boczar, facts to support a conclusion that Ms. McAfee was still refusing to provide the necessary information as to the dog's location.

Nor did the district court consider and weigh the testimony of Sgt. Boczar, giving deference to the jury's verdict of no malice.

If we assume that the criminal complaint lacks sufficient indicia of probable cause to support reasonable reliance on the warrant, the legal rule is that it is proper to consider any contemporaneous oral statements to the Magistrate in conjunction with the supporting affidavit/criminal complaint in assessing the reasonableness of an officer's reliance on a warrant. *U.S. v Legg,* 18 F.3d 240, 243 (4th Cir. 1994). Omitting the information orally provided to the Magistrate by animal control officer Sgt. Boczar is a fatal flaw to the district court's denial of Qualified Immunity.

The insistence by the district court that Ms. McAfee had volunteered to lead Sgt. Boczar to the location of the dog and that Sgt.

Boczar had admitted that Ms. McAfee had said she could find the dog is contrary to the Plaintiff's testimony. The only thing Ms. McAfee said she told Sgt. Boczar was that she could probably find the house. (JA 101)

Sgt. Boczar's testimony is that Ms. McAfee, upon being asked for the location of the dog, stated that she, McAfee, had gone to the location with a friend and thought she could get back to the location with the friend. Sgt. Boczar asked her to contact her friend to get back with Sgt. Boczar, and that nothing could be done until the location of the dog was revealed. (JA 249-253.)

Even if you omit this testimony of Sgt. Boczar, there is no evidence in the record that Ms. McAfee did communicate back with Sgt. Boczar. Instead, Ms. McAfee communicated with Ms. Yates and Nurse Wampler. According to Ms. Yates and Nurse Wampler, Ms. McAfee did not hand over the information. The reasons, according to Nurse Wampler, being that (1) Ms. McAfee had concerns about what would happen to the dog after the location was revealed and (2) that she would not hand it over because McAfee did not want the dog to be euthanized. (JA 218, 223; 257-260.)

So assume that the statement made by Sgt. Boczar in the criminal Complaint is not available for the Magistrate to consider and that Sgt. Boczar added to her oral statement to the Magistrate that Ms. McAfee had told Sgt. Boczar that she, McAfee, could probably find the house with the help of a friend but never got back with Boczar. Appellant submits that neither the deletion of the criminal Complaint nor the addition of the assertion that Ms. McAfee advised Boczar that she could probably find the house with the help of a friend but never got back with Boczar is conduct rising to the level of a "flagrant police action" *Simmons v. Poe*, 47 F.3d 1370, 1383-84 (4th Cir. 1995).

The presence of the criminal Complaint, a document determined by the Magistrate to be vague (JA 273), was definitely not a presentation to the Magistrate the absence of which would have defeated probable cause. Nor would the information that Ms. McAfee could probably find the house with the help of her friend but never got back to Sgt. Boczar dispositive of the issue of probable cause.

The information provided to the Magistrate, at the Magistrate's request, by Sgt. Boczar, and corroborated by Ms. Yates and Nurse

Wampler is sufficient on its own to support probable cause. (JA 212-218, 254-256, 257-260.)

There is no evidence that Sgt. Boczar intentionally and/or deliberately falsified her allegations to or hide from the Magistrate material facts she knew would defeat probable cause.

Appellant submits that not only does the information she gave to the Magistrate more than adequately support probable cause but also that the information now corroborated before the jury by the testimony of Ms. Yates and Nurse Wampler supports Sgt. Boczar's statement in her criminal Complaint that Ms. McAfee "refuses to give information on the location of the dog." Boczar believed the statement to be true and the statement was corroborated and bolstered by her conversation with Ms. Yates and Nurse Wampler. The information given by Sgt. Boczar to the Magistrate including the information in the criminal Complaint was truthful because this information was "believed or appropriately accepted by [Sgt. Boczar] as true." *Franks,* 47 F.3d at 165.[3]

---

[3] In *Illinois v. Gates*, 462 U.S. 213 (1983) the Supreme Court stated after-the-fact scrutiny of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference. *Id.* at 236. "'[T]he term 'probable

Sgt. Boczar requested that Ms. McAfee talk to the friend who knew the location of the dog and to get back with Sgt. Boczar. Ms. McAfee, rather than communicating back with Sgt. Boczar, called the Health Department and thereafter dealt with Ms. Yates and especially Nurse Wampler.

The ten day window to protect Ms. McAfee and the public from the potential of rabies was quickly closing so Sgt. Boczar communicated with Ms. Yates and Nurse Wampler with the Health Department.

---

cause', according to its usual acceptation, means less than evidence that would justify condemnation....It imports a seizure made under circumstances which warrant suspicion.'" *Id.* at 235 (quoting *Locke v. United States*, 7 Cranch. 339, 348, 3 L.Ed. 364 (1813)). "'[T]he quanta...of proof' appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant." *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 173 (1949). "[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Id.* (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969). Probable cause is a "practical non-technical conception" where we deal with probability. The consideration of probable cause is not technical. It is a totality of the circumstances with factual and practical considerations of life on which reasonable people act. Just as jurors are permitted to formulate certain conclusions about human behavior, so too may law enforcement officials. *Id.* at 231-232 (citations omitted). Accordingly, Boczar submits the information given to the Magistrate meets the probable cause requirements, and that because Boczar sought a warrant she is entitled to the protection of Qualified Immunity even though the jury found no probable cause.

Ms. McAfee conferred with Nurse Wampler eight times over two to three days. There can be no doubt of the soundness of Sgt. Boczar's conclusion that Ms. Yates and Nurse Wampler had not been provided information on the location of the dog based on Sgt. Boczar's unrefuted testimony (1) that Ms. McAfee had not revealed the information to Ms. Yates though McAfee had spoken to Yates; (2) that Nurse Wampler did not have documentation on the whereabouts of the dog and believed that McAfee was not going to hand over that information because McAfee feared the dog would be killed; and (3) that McAfee had arranged for a home for the dog in another county (which fact alone Boczar submits is sufficient for a violation of Virginia Code § 18.2-313.1.)

The case before the district court was not one where in fact Ms. McAfee did not know the location of the dog from the start. The district court acknowledged during a colloquy with counsel during the trial that there was no doubt that Ms. McAfee knew the location of the dog. (JA 310.) This acknowledgment by the district court is supported by the following evidence: emails between Ms. McAfee and Jody Grove, the lady who asked Ms. McAfee's help to get the dog a house (JA 719-730,

732-733, 734, 735, 737-738); the transcript of the Jody Grove deposition presented to the jury not by written document but by video (JA 309; 468-508); Ms. McAfee's trial testimony ("We [Grove and McAfee] weren't ever going to send him [the dog] to Animal Control") (JA 152-155); the McAfee conversations with her friend Claire Pollard (JA 189-192); Defendant's Exhibits 21 and 23 (JA 737-740); Ms. McAfee's statement to her doctor that she wanted to get a rabies shot rather than have the dog sacrificed (JA 744); and Ms. McAfee's trial testimony (JA 89, 97, 99, 102, 106-107, 109-111, 156-158, 160, 172).

Sgt. Boczar did not institute a prosecution upon on such slight grounds of suspicion as to indicate a general disregard of the rights of Ms. McAfee. A prosecution so instituted is malice in fact, which the jury decided was not present. *Freezer*, 176 S.E. at 170.

A related error by the district court was to respond with the answer "No" to the Jury's inquiry: "any lawful authorized government agent includes the health department nurse?" (JA 399-400, Court Exhibit 6 and 7.) With this answer, the district court foreclosed from the jury's consideration an important fact in support of probable cause. The answer of the district court should have either been "yes" or "I did

not instruct you on that matter so it is not a matter for your consideration." But answering with the word "No," the district court stated to the jury that Health Department Nurse Wampler was not a lawfully authorized government agent. This conclusion is incorrect.

A Health Department Nurse in the Commonwealth of Virginia is a lawfully authorized government agent. This conclusion is supported by Sections (ii) and (iii) of Virginia Code § 18.2-313.l. Defendant's objected to the district court response of "No" to the jury. (JA 378-385.)

Moreover, this question about Nurse Wampler being a lawful authorized government agent tied together with the questions asked of the district court by the jury just before this question, demonstrated the significance to the jury of the conversations between Nurse Wampler and Sgt. Boczar, and between Nurse Wampler and Ms. McAfee. It proves why the information provided to Sgt. Boczar by Nurse Wampler was not to be disregarded by the Court. (JA 396-397.)

Sgt. Boczar is entitled to exercise common sense and conclude based on the totality of circumstances that there was suspicion and proof that Ms. McAfee was knowingly withholding information from a lawfully authorized government agent.

Just as in *Wiggs v. Farmer,* 205 Va. 149, 151, 135 S.E.2d 829, 831 (1964) (also a dog bite, move the dog out of the county case), Sgt. Boczar conferred with others before seeking a warrant, including the Assistant Commonwealth Attorney (JA 270-272) and two county health officials, which county health officials along with Sgt. Boczar had a serious responsibility for ensuring that the dog was not rabid and that Ms. McAfee and other members of the public would not die.

It would have been objectively unreasonable for an Animal Control Officer under the circumstances set forth in this case with the information received from the Health Department Officials and from the victim of the dog bite herself to not pursue getting a warrant.

Sgt. Boczar respectfully submits that her conduct did not fall into the intentional falsification exception that would deny her the protection of the warrant she sought in this case. No reasonable person in Animal Control Officer Boczar's position would have known or thought that doing what Boczar did in this case was a flagrant police action in violation of the law set out in *Franks v. Delaware*; *Miller v. Prince George's County, Md.; Simmons v. Poe*; *Messerschmidt v. Millender*; and *Freezer v. Miller.*

Just the fact that the jury reimbursed Ms. McAfee for the stipulated $2,943.60 she spent to defend herself in the criminal action, but found no malice in fact, no punitive damages or actual malice, and no damages-physical, emotional or punitive, compels the conclusion that the jury found no flagrant or even non-flagrant wrongdoing by Sgt. Boczar, a conclusion to which any court must give great weight in determining Qualified Immunity, especially in the case where a warrant is involved.

## II. The District Court Erred in Awarding Attorney's Fees.

### A. The Applicable Standard of Review.

The standard of review regarding a fee award depends on the issue. The reasonableness of the district court's fee award is reviewed for an abuse of discretion, whereas questions of law concerning a fee award are reviewed de novo. *Johannsen v. Dist. No. 1-Pac. Coast Dist., MEBA Pension Plan*, 292 F.3d 159, 178 (4th Cir. 2002), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 544 U.S. 105 (2008).

Here, the review is *de novo* because the district court erred on matters of law when justifying the fee awards.

## B.    Ms. McAfee Did Not Obtain a Successful Verdict.

The inquiry for the appeal is whether Ms. McAfee was successful in her litigation, thereby entitling her to an award of attorney's fees. She filed a three count Complaint.  The claim for false imprisonment was dismissed during trial.  The jury found in favor of Sgt. Boczar on the claim for malicious prosecution, thereby concluding that Sgt. Boczar did not act maliciously.  The jury rejected the claim for punitive damages, thereby concluding that Boczar did not act with ill will, malevolence, grudge, spite, wicked intention, or a conscious disregard of the rights of another.  The jury awarded only $2,943.60 (JA 393), the exact figure for Ms. McAfee's stipulated expenses incurred in the criminal case.  (JA 331.)  The jury, in other words, did not award Ms. McAfee a penny for her claimed mental anguish, inconvenience, suffering, or embarrassment.  The jury concluded there was an unintentional, technical violation of the Fourth Amendment that resulted in no damages to Ms. McAfee other than $2,943.60 in stipulated actual expenses.  Ms. McAfee essentially got nothing from the jury after a four day trial.

The operative statute states that a "prevailing party" *may* be entitled to recover a "reasonable attorney's fee." Section 1988 is unlike other fee shifting statutes because it is discretionary, not mandatory: "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b).

The Supreme Court's opinion in *Hensley v. Eckerhart*, 461 U.S. 424 (1983) is the leading case for establishing the formula for the calculation of a "reasonable attorney's fee" under § 1988: "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* at 433. This formula is sometimes known as the "lodestar" calculation, and the resulting figure the "lodestar amount" or "lodestar figure."

The Supreme Court in *Hensley* and *Blanchard v. Bergeron* adopted the twelve factors from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) as relevant considerations when calculating the lodestar amount. *Hensley*, 461 U.S. at 434 fn. 9; *Blanchard v. Bergeron*, 489 U.S. 87, 91-92 (1989).

As far as how to apply the *Johnson* factors, the Supreme Court held that some of the twelve factors are essentially "subsumed within the initial calculation of the hours reasonably expended at a reasonable hourly rate." *Hensley*, 461 U.S. at 434 fn.9. Those factors that were not subsumed are applied afterwards to adjust the amount, as necessary.

The computation of the lodestar figure does not end the inquiry. *Hensley*, 461 U.S. at 434. The district court may consider other factors to adjust the fee upward or downward including the results obtained, i.e., the plaintiff's success. *Id.* Fourth Circuit jurisprudence is in accord with the Supreme Court on this issue. In *Robinson v. Equifax Information Servs., LLC*, 560 F.3d 235 (4th Cir. 2009), the Fourth Circuit directed district courts, after arriving at the lodestar figure, to analyze issues related to the prevailing party's success in the case.

According to the Supreme Court in *Hensley*, there are two separate components to "success:" (1) subtracting fees for hours spent on unsuccessful claims; and (2) adjusting the award depending on the degree of success by the plaintiff. *Hensley*, 461 U.S. at 434; *see also Robinson*, 560 F.3d 235 at 244. The second component to success is particularly relevant in this appeal, i.e. overall success.

The Memorandum Opinion on fees attempted to unravel the confusion that abounds over the *Johnson* factors, including whether they should be applied at all, when they are applied during the calculation, and to what extent the factors are subsumed during the lodestar calculation. (JA 655-62.)

Whatever the merits to the district court's analysis of the *Johnson* factors,[4] Sgt. Boczar asserts that the district erred as a matter of law because it awarded Ms. McAfee attorney's fees despite her lack of success. In doing so, the Memorandum Opinion regarding fees conflicts with multiple Supreme Court opinions.

In *Hensley*, the Supreme Court held that the plaintiff's success was the "critical" factor to be considered after the lodestar amount was computed because otherwise the amount may be excessive. *Hensley*, 461 U.S. at 436. Congress did not authorize a fee award whenever it

---

[4] The district court claimed *Perdue v. Kenny*, 559 U.S. 542, 130 S.Ct. 1662 (2010) eviscerated the *Johnson* factors. (JA 659.) For the reasons discussed elsewhere, Sgt. Boczar argues the district court's reliance on *Perdue* was mistaken. This interpretation cannot be squared with the *Perdue* opinion, which did not address the wisdom of the *Johnson* factors. The Supreme Court has approved them, and to reverse itself without mentioning its jurisprudence on this issue would be unlikely. *See Blanchard v. Bergeron*, 489 U.S. 87, 91-92 (1989).

may be reasonable to bring a lawsuit: "Again, the most critical factor is the degree of success obtained." *Hensley*, 461 U.S. at 436. On this issue, the Supreme Court held that the district court had to consider "the relationship between the extent of success and the amount of the fee award" such that the fee would be reduced if the level of success, even if significant, was limited in comparison to the scope of the litigation as a whole." *Hensley*, 461 U.S. at 438-39.

The Supreme Court revisited the issue in *City of Riverside v. Rivera*, 477 U.S. 561, 574 (1986). The issue in *Rivera* was whether a reasonable attorney's fee should mimic private practice fee arrangements, such as a 1/3 contingency fee based on the outcome. The four justice plurality rejected a strict rule of proportionality between the amount of the proposed fee and the amount of the verdict. The plurality opinion made clear that it was merely applying the *Hensley* test, not diminishing it. The district court had concluded that the plaintiffs obtained "excellent results" and outstanding accomplishments in a complex case. *Rivera*, 477 U.S. at 579. The eight plaintiffs had obtained 37 individual verdicts. Their awards included $33,350 for

compensatory and punitive damages. The fees requested were $245,456, only eight times the damages. *Rivera*, 477 U.S. at 564-65.

The *Rivera* plurality opinion was limited to concluding that a contingency arrangement should not be the model for calculating a reasonable attorney's fee and that there is no strict rule of proportionality. As a plurality opinion, its holding is limited to the narrowest grounds that at least five justices who supported the judgment agreed upon. *Marks v. United States*, 430 U.S. 188, 193 (1977); *A.T. Massey Coal Co. v. Massanari*, 305 F.3d 226, 236 (4th Cir. 2002). No majority in *Rivera* rejected in whole or in part *Hensley's* holding that success was the critical factor. In fact, a majority in *Rivera* held that there was success.

Next, in *Farrar v. Hobby*, 506 U.S. 103 (1992), the Supreme Court addressed two issues: whether a $1 verdict made a plaintiff a "prevailing party" under § 1988 and, if so, what would be a reasonable attorney's fee given the verdict? The Supreme Court held that $1 satisfied the "prevailing party" requirement of § 1988, 506 U.S. at 111-12, but the lack of success meant that the plaintiff was not entitled to an attorney's fee award. 506 U.S. at 115. Despite being a prevailing

party, the plaintiff got no attorney's fees. Returning to *Hensley* and relying on *Rivera*, the Supreme Court repeated that the plaintiff's overall success was the most critical factor in determining if an attorney's fee was reasonable. *Farrar*, 506 U.S. at 114. If the purpose of the suit is to recover private damages, the district court is obligated to give primary consideration to success by considering the amount of damages awarded as compared to the amount sought. *Farrar*, 506 U.S. at 114 (quoting *Rivera*, 477 U.S. at 585).

Particularly relevant to this appeal, the Supreme Court held that this success issue is potentially *separate* from the lodestar computation: "Having considered the amount and nature of damages awarded, the court may lawfully award low fees or no fees without reciting the 12 factors bearing on reasonableness...or multiplying 'the number of hours reasonably expended... by a reasonable hourly rate.'" *Id.* at 115 (internal citations omitted).

*Farrar's* holding was not limited to $1 verdicts. It was based on the application of the *Hensley* rule applicable in all such cases, namely that the degree of overall success is the primary factor. The Fourth Circuit has not limited *Farrar* to merely $1 or nominal verdicts. The

Fourth Circuit has held that the *Farrar* holding requires the district court when determining a reasonable attorney's fee to give primary consideration to success by considering the amount of damages awarded as compared to the amount sought as long as the purpose of the suit was to recover private damages. *Hetzel v. County of Prince William*, 89 F.3d 169, 173 (4th Cir. 1996).

The First Circuit addressed a similar case in *Lewis v. Kendrick*, 944 F.2d 949 (1st Cir. 1991). It held that the prevailing plaintiff was not entitled to any attorney's fees because of the small size of the judgment. In *Lewis*, two police officers conducted a fifteen minute investigation of an alleged altercation and then arrested the plaintiff at the scene. The plaintiff was taken to the station house and incarcerated for one hour and forty five minutes awaiting bail. *Id.* at 951. A ten day trial for false imprisonment under § 1983 and state law resulted in a verdict against two police officers and the city, initially for $5,608.55, reduced on appeal after rehearing to $1,608.55 *Id.* at 954, 957. The fee application was $132,778 for fees and $6,960 for costs, but the district court awarded only $49,658 in fees and $4,198 in costs. *Id.* at 951 fn.1.

The First Circuit held that the plaintiff, despite being a prevailing party, was not entitled to *any* attorney's fees. Applying *Hensley* and *Rivera*, the First Circuit concluded that it was necessary to consider the overall success, and noted that the plaintiff had barely recovered and did so only for false imprisonment. *Lewis*, 944 F.2d at 955-56. The First Circuit said:

> The fee provisions in § 1988 of the Civil Rights Act are intended to enable injured parties to obtain counsel, not to enable counsel to obtain munificent fees. To turn a single wrongful arrest into a half year's work, and seek payment therefore, with costs, amounting to 140 times the worth of the injury, is, to use a benign word, inexcusable. We should not tolerate, even by a partial award, such an imposition by counsel on the defendants, and on the court. In the exercise of the statutory discretion, we reverse the award of fees altogether.

*Id.* at 956. In dissent, Justice Breyer agreed the requested fee was out of proportion with the recovery, but would have remanded for a "small fee." *Id.* at 959.

Here, Ms. McAfee obtained a nominal victory with a *de minimis* award. "Nominal" is defined as, when related to price or amount: "trifling, esp. as compared to what would be expected." *Black's Law Dictionary* 1148 (9th ed. 2009). The total fees/expenses awarded

($345,274.01) are 117 times the size of the verdict ($2,943.60). In light of the stipulation in this case, the plaintiff in *Lewis* arguably achieved a greater success because of the $1,600 recovery.

The district court as a result was obligated to award no attorney's fee (or a nominal fee) without consideration of the lodestar calculation. *Farrar*; *Simpson v. Sheahan*, 104 F.3d 998, 1001-02 (7th Cir. 1997).

Beginning post-trial, Ms. McAfee and the district court claimed Ms. McAfee only wanted to vindicate her constitutional rights and that this mitigated her lack of success. (JA 689.) It should suffice to rebut this argument to note that at no time during the trial of this case or in any pre-trial pleading did Ms. McAfee state or concede that she was merely seeking to redress her constitutional rights and was not seeking private damages. Ms. McAfee's pleadings, her evidence at trial, her opening statement, and her closing argument to the jury all claimed and sought private damages, including punitive damages. Ms. McAfee argued for a large award. She cannot escape these facts post-trial.

The purpose of the suit was the recovery of private damages. McAfee's counsel told the jury that the case was not limited to her out-of-pocket expenses: "But that's not what this case is really about." (JA

338.)  Counsel made an impassioned plea to the jury for compensatory and punitive damages claiming, among other injuries, "great insult and humiliation and mental anguish."  She claimed she lost 20 pounds, lost sleep, lost energy, had nightmares, and that she still feels humiliated, embarrassed, and afraid.  (JA 339.)  Counsel told the jury:

> Of course, money can never really compensate for what has been done here, but money is the only remedy the law has to offer.  So what is the right number to compensate Ms. McAfee?  Is it $50,000?  Is it $500,000?  Something else?  Is it something more?  You decide.

(JA 338-339.)

*Farrar* dictates that success is the critical component because this case was about the recovery of private damages.  The district court erred concluding otherwise, and further erred by not applying the holdings from *Hensley*, *Farrar*, and *Hetzel*.

The district court's arguments were legally insufficient to vary from these precedents.  For example, the district court used the fact that this was a civil rights action to justify a large award of fees, citing *Rivera*.  (JA 671, 688-691.)  This ignores *Hensley* and *Farrar*.  Plus, relying on this fact is meaningless since, by definition, all § 1983 cases are civil rights claims (including *Hensley*, *Farrar*, and *Hetzel*).  Excusing

a lack of success by claiming Ms. McAfee vindicated a constitutional right contradicts the plain language of § 1988, which states that the court *may* award attorney's fees. Had Congress intended that all civil rights cases automatically warranted all the fees sought, it could have said so. It did not, and the Supreme Court made the same point in *Hensley*. 461 U.S. at 436. The mere vindication of a constitutional right does not justify a fee award or negate a lack of success.

The district court's negative viewpoints of Sgt. Boczar and DRM were improper grounds as a matter of law for varying from established Supreme Court jurisprudence on success.

For example, the district court ordered Michael Parham, a non-party employee of the Commonwealth of Virginia, to attend the trial of the case, criticizing him in writing for failing, in essence, to settle the case or appreciating the perceived weaknesses in the case. (JA 796-97.) A magistrate judge responsible for handling confidential settlement discussions in the case published an Order accusing the Division of Risk Management of failing to make a good faith effort to resolve the matter. (JA 581.) In addition, the district court cited this Order in its fees

opinion (JA 684-85) and criticized both Sgt. Boczar and DRM for not settling the case on Ms. McAfee's terms. (JA 139-40; 182-84; 684; 692.)

The district court's reliance on these matters was error as a matter of law because they were confidential and the district court does not know what happened during settlement discussions. Also, Sgt. Boczar cannot respond to these matters.

The lodestar calculation requires a consideration of the reasonable number of hours incurred in a case. If a case does not settle, then more hours are required for it. Courts have held that this is a proper consideration in the number of hours as part of the lodestar calculation.

The district court, on the other hand, erred by minimizing McAfee's lack of success by subsuming success into the reasonable number of hours figure of the lodestar calculation: "Nonetheless, those explanations teach that the degree of success analysis is part of the time component of the lodestar calculation." (JA 686, 687 fn.19.) The Supreme Court in *Hensley* and *Farrar* specifically did not limit a "success" analysis to the number hours expended. If a plaintiff achieved only partial or limited success, the lodestar calculation may result in an excessive award. Overall success is the most critical factor because:

> Congress has not authorized an award of fees whenever it
> was reasonable for a plaintiff to bring a lawsuit or whenever
> conscientious counsel tried the case with devotion and skill.
> Again, the most critical factor is the degree of success
> obtained.

*Hensley*, 461 U.S. 436.

The district court committed error because it improperly used as a factor in its analysis the defendant's failure to settle the case on the plaintiff's terms. (JA 692; 796.) No defendant can be criticized for wanting a jury to resolve its dispute, for denying that it was liable to the plaintiff, or for not settling a case on the plaintiff's terms because the district court wanted the defendant to settle.

It is well-established that a court may encourage settlement, but it abuses its discretion when it seeks to coerce the parties to settle. *Goss Graphics Sys., Inc. v. DEV Indus.*, 267 F.3d 624, 627 (7th Cir. 2001). A court also abuses its discretion when it punishes a party for failing to settle. *Kothe v. Smith*, 771 F.2d 667, 669 (2nd Cir. 1985) (holding district court abused its discretion through a sanction to 'get the attention of the carrier'). Here, the record reveals the similarity of this case to both *Goss* and *Kothe* because of the district court's attempts to coerce settlement, annoyance when that did not happen, then

culminating in the use of a large fee award to punish Sgt. Boczar and DRM, a non-party. (JA 139-40; 182-85; 691-92.)

The jury awarded Ms. McAfee not a penny over her stipulated economic losses. While the district court may have been impressed with the plaintiff's case, the jury was not. The district court expressed its antipathy to Sgt. Boczar as a factor in the success component of a reasonable attorney's fee. (JA 690-91.) This was error as a matter of law. In *Simpson v. Sheahan*, the Seventh Circuit held that a fee award under § 1988 may not be used to punish a defendant and that the court's disapproval of the defendant's behavior was not a relevant factor to a fee award. 104 F.3d at 1003. Using a fee award to sanction a party was an abuse of discretion and merited reversal. *Id.*

The district court's viewpoint in this case was not a relevant factor to whether Ms. McAfee was successful. She was not, and the fact that district court was not impressed with Sgt. Boczar does not alter that dispositive fact.

The district court's reliance on its own view of Sgt. Boczar was legal error for the additional reason that it contradicted the findings of the jury. (JA 690.) The jury rejected the Plaintiff's argument that Sgt.

61

Boczar acted maliciously. The jury found only a technical violation of the Fourth Amendment without any ill will by Sgt. Boczar. The district court was bound by the jury's findings, even if it disagreed with them. The district court imposed its own views over the findings of the jury by awarding fees to compensate for the Plaintiff's lack of success.

The district court erred as a matter of law when it sought to justify the large fee award on the grounds that it would punish Sgt. Boczar and a large fee award would serve as a warning to others. (JA 690-91.) The district court's opinions, factually unsupported as argued elsewhere, were an erroneous consideration as a matter of law.

In *Simpson v. Sheahan*, the Seventh Circuit held that the district court abused its discretion by using a fee award under § 1988 to sanction a party. 104 F.3d at 103.

Fee awards under § 1988 are not a punishment and are imposed with or without a showing of bad faith. *See Coalition for Basic Human Needs v. King*, 691 F.2d 597, 602 (1st Cir. 1982); *Pickett v. Milam*, 579 F.2d 1118, 1121 (8th Cir. 1978). In these cases, the Circuit Courts rejected arguments that fees should not be awarded under § 1988

because the defendants acted in good faith. The corollary would be true, that bad faith does not (even if shown) justify an enhancement.

Further, the district court's findings in this regard contradict those of the jury. The jury found no bad faith, no malice, and elected not to punish Sgt. Boczar. It is legal error for the district court to ignore those findings, impose its own contrary findings, and then seek to punish Sgt. Boczar in the face of the opposite decision by the jury.

Finally, the district court's reliance on *Perdue v. Kenny*, 559 U.S. 542, 130 S.Ct. 1662 (2010) was error. The district court interpreted *Perdue* as establishing a "strong presumption" that the lodestar figure was appropriate and any deviation *downward* required overcoming the strong presumption. (JA 654.) The district court then used this alleged standard to resist the holdings in *Hensley* and *Farrar*.

The issue in *Perdue* was whether a lodestar figure could be *increased* as a reward for "superior performance and results." *Id.* at 1669. A review of the opinion reveals that this issue, the reasoning, and the holding in the case were framed entirely in whether the district court could add a lump sum after the lodestar figure was calculated for superior legal work. At no time did the Supreme Court overrule,

dismantle, negate, narrow, or criticize its prior holdings in *Hensley* and *Farrar* concerning success and whether the lack of success negates an award of fees (or reduces it).

The district court erred by using a "strong presumption" standard because, by doing so, it overruled the Supreme Court's prior holdings. The "strong presumption" and "rare circumstances" referenced in *Perdue* concern gratuitous enhancements for superior legal work. *Perdue* did not purport to overrule the "success" jurisprudence extending as far back to *Hensley* in 1983. If the Supreme Court is going to reverse its jurisprudence, it will do so in a case involving the issue, will analyze the competing arguments, and will explain its rationale. *Perdue* was not a sweeping opinion reversing all prior case law, and there is no reason to apply its limited holding in such a manner to excuse Ms. McAfee lack of success in this case.

This Court should conclude that Ms. McAfee had no success on her claims and, as a result, was not entitled to the discretionary award of attorney's fees. If she was entitled to any fee, it should be *de minimis*, and this Court can set it without remand.

## C. Plaintiff Failed to Prove an Hourly Rate.

Ms. McAfee failed to prove a reasonable hourly rate and this failure should have resulted in a denial of her fee request. The movant has the burden of proving the reasonable hourly rate. *Robinson*, 560 F.3d at 244 (quoting *Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990)). The plaintiff "must produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which [they] seek[] an award." *Grissom v. The Mills Corp*, 549 F.3d 313, 321 (4th Cir. 2008); *Plyler*, 902 F.2d at 277. The reasonable hourly rate should be determined by evidence of what an attorney earns from "paying clients for similar services in similar circumstances." *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994); *Robinson*, 560 F.3d at 244.

Here, Ms. McAfee sought to prove a reasonable hourly rate through the "Affidavit of Craig T. Merritt." (JA 460.) Mr. Merritt conceded, "This case did not present a high level of legal complexity compared to some civil matters routinely litigated in this judicial division." (JA 462.) This was a polite understatement for a malicious prosecution case with less than $3,000 in special damages.

The Affidavit failed to prove a reasonable hourly rate for similar services in similar circumstances because the factors relied upon were irrelevant or only partially relevant as a matter of law to determining a reasonable hourly rate. The Affidavit used the Laffey matrix from Washington, D.C., national surveys, and self-reported hourly rates from big law firms. None of his research revealed what paying clients actually pay for similar work, i.e. essentially plain tort work with modest/low special damages. Big firms can charge what they want to large clients in other matters, but those rates are irrelevant to the calculation of a reasonable hourly rate here.

Ms. McAfee presented no evidence relevant to the calculation of a reasonable hourly rate. *See Westmoreland Coal Co. v. Cox*, 602 F.3d 276, 290 (4th Cir. 2010); *see also Rum Creek Coal Sales*, 31 F.3d at 175 (holding that actual rates charged and collected in the past is relevant); *Depaoli v. Vacation Sales Assoc., L.L.C.*, 489 F.3d 615, 622-23 (4th Cir. 2007) (considering fees actually charged by the lawyer to the client in the subject case).

Ms. McAfee elected not to include her own fee arrangement or her actual billings in this case. No evidence from Ms. McAfee or Mr.

Merritt addressed whether any of the big firm rates concerned litigation like this, civil rights litigation, or anything remotely comparable.

This resulted in a failure of proof on this issue. The district court was obligated to deny the Motion outright. Rather than do so, it entered an Order explaining deficiencies in the Plaintiff's Motion and instructing her how to fix them.[5] (JA 582-84.) Ms. McAfee did not do so, at least as they relate to the reasonable hourly rate.

This case is similar to *Buffington v. Baltimore County*, 913 F.2d 113 (4th Cir. 1990), *cert. denied*, 499 U.S. 906 (1991). In *Buffington*, a § 1983 case, the Fourth Circuit addressed a fee application where litigation partners at a big Baltimore firm sought their normal high end hourly rates in a civil rights case. *Id.* at 129. The Fourth Circuit rejected their attempt to establish a reasonable hourly rate by comparing their experience with "complex civil litigation" and cited with approval a case holding that the market rate for "federal civil litigation" was too broad. *Id.* at 129 (citing *Perkins v. Mobile Housing Bd.*, 847 F.2d 735, 737 (11th Cir. 1988)). Per the Fourth Circuit, the partners'

---

[5] Courts rarely instruct parties how to fix errors of proof and guide them in their efforts to do so.

billing rates in the high end private market were an "impermissible" factor. *Id.* The attorney's own billing rates in other cases were not reliable measures if the attorney did not specialize in the area of law at subject in the lawsuit. *Id.* at 130.

Ms. McAfee had the burden of proof on what was a reasonable hourly rate. She failed to establish it. She did not rectify the problem after instructions from the district court. She should not be given a third bite at the apple with more guidance. The matter was submitted, and her request for attorney's fees should be denied for this failure.

## Conclusion

Sgt. Boczar asks the Court to reverse the judgment of the district court and enter final judgment in her favor based on Qualified Immunity. In the alternative, Sgt. Boczar asks this Court to find that Ms. McAfee did not succeed in any material respect and, as a result, award no attorneys' fees or a *de minimis* amount without remand.

## Request for Oral Argument

Appellant requests oral argument because she believes that it would assist the decisional process.

CHRISTINE M. BOCZAR


/s/ Henry S. Keuling-Stout
Henry S. Keuling-Stout
Virginia bar number 15289
Attorney for Christine M. Boczar
Keuling-Stout, P.C.
125 Clinton Avenue East
Big Stone Gap, VA  24219-2925
(276) 565-9348  Telephone
(276) 523-1608  Facsimile
keulingstout@gmail.com

Michael R. Ward
Virginia bar number 41133
Attorney for Christine M. Boczar
Morris & Morris, P.C.
P.O. Box 30
Richmond, VA 23218-0030
Phone:  (804) 344-8300
Fax:  (804) 344-8539
mward@morrismorris.com

## Certificate of Compliance

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this brief contains <u>13,953 words</u>, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief has been prepared in proportionally spaced font, <u>Century Schoolbook, 14 point using Microsoft Word.</u>

This the 29th day of April, 2013.


<u>/s/ Henry S. Keuling-Stout</u>
Henry S. Keuling-Stout

## Certificate of Filing and Service

I hereby certify that the required copies of the foregoing Opening Brief of Appellant and Joint Appendix were filed with the Clerk, United States Court of Appeals via hand delivery and electronically using the Court's CM/ECF system, which sends notification of such filing to the following:

Stephen C. Piepgrass
TROUTMAN SANDERS, LLP
1001 Haxall Point
P.O. Box 1122
Richmond, VA 23218-1122
(804) 697-1320
*Counsel for Appellee*

This the 29th day of April, 2013.

/s/ Henry S. Keuling-Stout
Henry S. Keuling-Stout

*Counsel for Appellant*